Filed 6/17/22  P. v. DeLeon CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO ARTURO DELEON,<br><br>        Defendant and Appellant. | A159925<br><br>(San Mateo County<br>Super. Ct. No. 16-NF-011144-A)<br><br>**ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION**<br><br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

IT IS ORDERED that the opinion filed on June 14, 2022, is modified to read as follows and the petition for rehearing is DENIED:

On page 14, the end of footnote 3 is modified to add three new sentences that read: "In any event, DeLeon fails to demonstrate remand would be appropriate. (*See People v. Morrison, supra,* at p. 225; *People v. Leon* (2016) 243 Cal.App.4th

1

1003, 1026.) Defense counsel asked the trial court, at sentencing, to exercise its discretion to impose a lesser enhancement, citing *Morrison*. And the trial court affirmatively indicated it understood its discretion."

There is no change in the judgment.

Dated:＿＿＿6/17/2022＿＿＿＿＿＿＿Simons, J.＿, Acting P.J.
A159925

2

Filed 6/14/22  P. v. DeLeon CA1/5 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO ARTURO DELEON,<br><br>    Defendant and Appellant. | A159925<br><br>(San Mateo County<br>Super. Ct. No. 16-NF-011144-A) |

Alejandro Arturo DeLeon appeals after a jury convicted him of second degree murder (Pen. Code, § 187, subd. (a))[1] and possessing a firearm as a felon (§ 29800, subd. (a)(1)), and it also found "true" an enhancement allegation that DeLeon personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  The trial court sentenced him to an indeterminate prison term of 42 years to life.

DeLeon asserts: (1) the prosecutor's peremptory challenge of an African-American prospective juror violated *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (2) the trial court erroneously admitted experimental evidence; and (3) the trial court abused its

---

[1] Undesignated statutory references are to the Penal Code.

1

discretion by declining to strike the firearm enhancement. We affirm.

## BACKGROUND

### A.

In September 2016, DeLeon shot and killed Daniel Corona in the parking lot of a PetSmart store in San Mateo. The prosecution's theory was that DeLeon formed a deliberate and premeditated intent to kill Corona because he was angry about being disrespected by Corona, who was a Sureño gang member. DeLeon admitted shooting Corona but testified that he shot Corona in self-defense.

On the evening in question, Louis Mercado was driving a silver Volvo. DeLeon was his passenger. They encountered Corona, and his friends (E. L., Jose A., Daisy F., and Diana N.), in a gold Lexus in the parking lot of a liquor store. DeLeon greeted Corona and his friends by walking up to the Lexus and saying, " 'thought I recognized one of y'all niggas.' " E. L. and Corona exited the Lexus to confront DeLeon. Angry words were exchanged but ultimately Corona and E. L. got back in the car and left.

Corona had previously parked his truck in the PetSmart parking lot, which was about one block away from the liquor store. He and his friends drove there (in the Lexus), with beer Corona had purchased.

Shortly after Corona and his friends left the liquor store parking lot, Mercado drove extremely fast to DeLeon's father's apartment, a few blocks away from the PetSmart. DeLeon retrieved a handgun and placed it in the waistband of his pants.

Mercado then drove the Volvo and DeLeon to the PetSmart parking lot. DeLeon exited the car, holding a gun. Corona and his friends ran in different directions. Witnesses heard multiple

2

(three to four) shots fired and then saw Corona fall to the pavement.

Jose A. testified that Corona had not been armed. Police discovered no guns, ammunition, or gun paraphernalia when they searched Corona's truck and apartment. However, immediately after the shooting and the departure of the Volvo, Corona's friends gathered around him. One witness observed a female (matching Daisy F.'s description) approach a male (who was crouched behind a car) and give him a bag.

**B.**

San Mateo Police Department officers pursued, and attempted to pull over, the Volvo after DeLeon and Mercado fled the scene. Instead of complying, Mercado drove erratically—at speeds up to approximately 115 miles per hour—weaving through traffic on several freeways, to evade the officers. DeLeon and Mercado were ultimately detained in San Francisco.

During the pursuit, an officer observed someone throw a black object under a bridge, from the passenger side of the Volvo. When police searched the embankment below, they found a loaded Smith & Wesson semiautomatic handgun. The gun's serial number matched that of a gun seen in a photograph found on DeLeon's phone.

Firearms experts opined that the gun found under the bridge was the same one that fired most of the bullets and shell casings found at the scene of the shooting.

The jury heard recordings of numerous phone calls DeLeon made while in jail. The day after the shooting, DeLeon told his girlfriend that she should not expect him to be released because the police had a lot of evidence against him "for murder." When his girlfriend mentioned having known Corona, DeLeon protested that "[Corona] was runnin' his fuckin' mouth" and "tried to push up on me."

3

## C.

DeLeon testified, in his own defense, that he shot Corona, after Corona threatened him, out of panic and fear that Corona was going to kill him.

DeLeon testified that Corona and E.L. challenged DeLeon to fight after he innocently mistook their identities at the liquor store. DeLeon was scared because Corona came very close to him and said, " 'Next time you call my homie "nigga," we gonna have a problem.' " DeLeon also testified that he heard Corona say, " 'I'll kill that motherfucker.' "

DeLeon abruptly left the liquor store, without making his intended purchase, and Mercado drove him to his father's apartment, in a hurry, because DeLeon had prearranged marijuana sales, including one in the PetSmart parking lot, and did not want to keep his customers waiting. DeLeon retrieved his gun and some marijuana.

Mercado drove DeLeon to the PetSmart parking lot, where DeLeon looked for an expected customer. Instead DeLeon saw Corona standing in front of his truck. Corona pulled up his shirt to reveal a chrome revolver, tucked into his waistband. Corona said, " 'What's up now, motherfucker?' "

When Corona pulled his gun out of his waistband and began walking toward DeLeon, DeLeon pulled out his own gun and fired it multiple times at Corona. DeLeon said he did so because he was scared and that he was not thinking of killing Corona or of anything else. DeLeon stopped shooting when Corona, after turning and running away, fell to the ground. DeLeon and Mercado did not stop the Volvo and discarded the gun, after realizing police officers were pursuing them, because DeLeon did not want to "get in trouble" for shooting Corona.

4

On cross-examination, DeLeon acknowledged that he had never mentioned in any of his post-arrest communications (with his girlfriend, his father, or police) that Corona had been armed.

## D.

The jury acquitted DeLeon of first degree murder but convicted him of second degree murder and possessing a firearm as a felon.[2]  The jury found the firearm enhancement allegation true but acquitted DeLeon of another count—shooting from a motor vehicle (§ 26100, subd. (c)).  The trial court sentenced DeLeon to an aggregate prison term of 42 years to life.

## DISCUSSION

## A.

DeLeon maintains the trial court improperly denied his *Batson/Wheeler* motion.  We disagree.

## 1.

Both the state and federal constitutions forbid a prosecutor from striking even a single prospective juror on account of race. (*Foster v. Chatman* (2016) 578 U.S. 488, 499; *People v. Baker* (2021) 10 Cal.5th 1044, 1071 (*Baker*).)

A trial court must analyze a defendant's *Batson/Wheeler* motion using a three-prong test.  First, the defendant must make out a prima facie case with facts sufficient to support an inference of discriminatory purpose.  Second, if the defendant succeeds in making such a showing, the burden shifts to the prosecutor to provide a race-neutral reason for the strike.  Third, assuming the prosecutor does so, the court evaluates the prosecutor's proffered reasons and determines whether they are legitimate or

---

[2] Before DeLeon testified, the parties stipulated that he suffered a felony conviction, in 2014, for possession of marijuana for sale (Health & Saf. Code, § 11359).

5

pretextual. (*Baker, supra*, 10 Cal.5th at p. 1071; accord, *Johnson v. California* (2005) 545 U.S. 162, 168, 170-171.) The ultimate burden of persuading the court—that purposeful discrimination has occurred—rests with, and never shifts from, the opponent of the strike. (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

## 2.

Here, jury selection took place over the course of four days. There were only three African-American prospective jurors in the venire—J.H., K.W., and Ashley N.—and all three were ultimately excused. J.H. was excused by the court, via stipulation, for hardship. The court excused K.W. for cause because K.W. remembered details about this case that he read in the newspaper. The People peremptorily challenged Ashley N., who was the only other African-American prospective juror.

The court's voir dire of Ashley N. indicated she was unmarried, had no children, and volunteered at an insurance agency. When asked by the court whether anyone in her family had been "a victim" of a crime, Ashley indicated that her mother had been victimized. When asked to explain, Ashley N. said a police officer "falsely pulled [her mother] over" and gave her "a false ticket, so we're going to court over that right now." Ashley believed the incident would not influence her in this case, even if numerous police officers testified, "because [any bad feelings were] towards the police officer and not them." She later added, "It's not like I have [any reason] to be . . . against the police."

When the prosecutor followed up on that point, Ashley stated that she had been a passenger while her mother was driving, her mother had made a right turn, and her mother had been stopped by a police officer and given a ticket. Ashley said the police officer had been "nonverbal" when her mother pointed out that there were no signs prohibiting a right turn. The ticket indicated her mother had made an illegal U-turn. However, Ashley N. believed she could be fair and impartial to both sides.

When asked by the court about any concerns she may have about serving as a juror on a case involving a gun, Ashley said, "I don't like handguns, but I'm not against them because I grew up with one in the house." Ashley later told the prosecutor that her mother kept a gun for protection. Her mother had shown it to Ashley, when she was a child, but instructed her not to touch it.

DeLeon's defense attorney asked Ashley if she could assess information critically. She replied, "Everything should be questioned." Ashley N. also raised her hand when the prosecutor asked if anyone believed intent could not be proved in a criminal trial.

When the prosecutor exercised a peremptory challenge to remove Ashley N. from the jury, DeLeon's counsel made a *Batson/Wheeler* motion (outside the presence of the jury), arguing that there was no evidence that Ashley could not be fair or impartial. Defense counsel also emphasized that Ashley had been the final African-American prospective juror in the venire.

The trial court denied DeLeon's motion, concluding that he had not presented a prima facie case of discrimination. The prosecutor only stated his reasons for challenging Ashley after the trial court found no prima facie case.

### 3.

This is a first prong case because the trial court concluded that DeLeon failed to establish a prima facie case *before* the prosecutor stated his reasons on the record. (See *People v. Scott* (2015) 61 Cal.4th 363, 386-389, 391; *People v. Bryant* (2019) 40 Cal.App.5th 525, 536, 539 (*Bryant*).)

The moving party establishes a prima facie case "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra,* 545 U.S. at p. 170.) This does not mean that there is any *requirement* to show a systematic exclusion of

7

multiple jurors on the basis of their membership in a protected class. (*People v. Battle* (2021) 11 Cal.5th 749, 773 (*Battle*).) Instead, the court considers all the relevant circumstances to determine whether the record supports an inference the prosecutor excused one or more prospective jurors because of race. (*People v. Rhoades* (2019) 8 Cal.5th 393, 429 (*Rhoades*).) Ordinarily we review the trial court's first prong decision deferentially, for substantial evidence. (*Battle, supra*, at p. 772.)

Certain types of evidence are especially relevant, including whether the prosecutor has struck most or all of the members of an identified group from the venire; whether the prosecutor has used a disproportionate number of their strikes against members of the same group; whether the prosecutor has engaged prospective jurors from that group in only superficial voir dire; whether the defendant is a member of the identified group; and whether the victim is a member of the group to which a majority of remaining jurors belong. (*Rhoades, supra,* 8 Cal.5th at p. 429.) We may also consider nondiscriminatory reasons for the prosecutor's challenge that " ' "necessarily dispel any inference of bias," ' " if those reasons are clearly established in the record. (*Ibid.*)

**4.**

Here, even if we assume (without deciding) that the trial court's decision is not entitled to deference and should be reviewed independently, as De Leon argues, we see no inference of discrimination.

DeLeon cannot show that the prosecutor peremptorily challenged most or all of the African-American jurors from the venire because the prosecutor only struck one. (*Rhoades, supra,* 8 Cal.5th at pp. 429-430.)  In these circumstances, it is very difficult, although not impossible, to make a prima facie case. (*Battle, supra,* 11 Cal.5th at p. 776.)

8

Nonetheless, DeLeon suggests close scrutiny is warranted because the prosecutor used a peremptory challenge against Ashley N. to excuse the only remaining African-American prospective juror he could have excused. (*Bryant, supra*, 40 Cal.App.5th at p. 537.) He suggests that the court's excusal of another African-American prospective juror (K.W.) for cause should be considered suspicious. We disagree.

It is true that the prosecutor challenged K.W. for cause. However, challenges for cause are distinct from peremptory strikes. (See *Rhoades, supra*, 8 Cal.5th at p. 435.) "Specious" for-cause challenges might support an inference of bias in some situations. (*Battle, supra*, 11 Cal.5th at pp. 782-783.) But, here, there is no indication that the for-cause challenge to K.W. was specious. K.W. indicated he remembered specific details about the case, including the chase, that he read in the newspaper. If the prosecutor believed K.W. would not be able to decide the case impartially solely on the evidence, this was a valid basis to challenge a juror for cause. (*People v. Farley* (2009) 46 Cal.4th 1053, 1093-1095.)

Ultimately we need not decide whether a peremptory challenge exercised against only one (but the final) prospective African-American juror raises any particular suspicion because there are no further circumstances suggesting that the prosecutor struck Ashley N. for racial bias. (See *People v. Parker* (2017) 2 Cal.5th 1184, 1212.)

The prosecutor did not use a disproportionate number of his peremptory challenges against African-Americans. The prosecutor's peremptory challenge to Ashley N. was his seventh and it was the only one exercised against an African-American prospective juror. Our review of the record shows no indication that the prosecutor's voir dire of Ashley was striking in any way. (See *Battle, supra*, 11 Cal.5th at p. 783; *Bryant, supra*, 40 Cal.App.5th at p. 539.)

9

There are no heightened concerns raised by the defendant's or victim's race because neither were African-American. The defendant need not be a member of the group in question to raise a *Batson/Wheeler* objection. (*Baker, supra,* 10 Cal.5th at p. 1080; *Powers v. Ohio* (1991) 499 U.S. 400, 402.) However, when the defendant is not a member of the group purportedly subject to discrimination, this circumstance weighs against a prima facie case. (See *Rhoades, supra*, 8 Cal.5th at pp. 429-430.)

Finally, any inference of bias is further weakened because the record reveals Ashley N. had obvious race-neutral characteristics that a reasonable prosecutor would seek to avoid. (See *Rhoades, supra,* 8 Cal.5th at p. 431.) Ashley's negative experience with law enforcement is clearly established by the record. Ashley also expressed her comfort and familiarity with guns. Further, she was skeptical about the prosecutor's ability to prove intent—a key issue in this murder case—beyond a reasonable doubt. These readily-apparent, nondiscriminatory reasons dispel any inference of bias. (*Rhoades, supra*, at pp. 432-434; *People v. Reed* (2018) 4 Cal.5th 989, 1001.)

We conclude, after an independent review of all the circumstances, that DeLeon failed to establish a prima facie case of racial discrimination.

**5.**

In 2020, the Legislature passed Assembly Bill Number 3070, which enacted Code of Civil Procedure section 231.7. (Stats. 2020, ch. 318, §§ 1-3.) The statute codifies the *Batson/Wheeler* principle—that peremptory challenges may not be made on the basis of a prospective juror's race. (Code Civ. Proc, § 231.7, subd. (a).) Among other changes, the new statute makes certain reasons for exercising a peremptory challenge—including having a negative experience with law enforcement—presumptively invalid. (*Id.,* § 231.7, subds. (e)-(g), (j).) However, the new law only applies to trials in which jury selection begins

on or after January 1, 2022.  (*Id.*, § 231.7, subd. (i).)  Because DeLeon's jury selection occurred in 2019, this statute does not lessen his burden to establish a prima facie case.

## B.

DeLeon also insists the trial court erred, and violated his due process and fair trial rights, by admitting experimental evidence that cast doubt on DeLeon's testimony that Corona was armed at the time of the shooting.  We conclude any error was harmless.

## 1.

The trial court has wide discretion, under Evidence Code section 352, to admit or reject experimental evidence.  (*People v. Peterson* (2020) 10 Cal.5th 409, 460.)  Before experimental evidence is admitted, its proponent bears the burden to establish that the experiment is relevant, that it was conducted under conditions substantially similar to those of the actual occurrence, and that it will not mislead or confuse the jury or take undue time.  (*Ibid.*)

## 2.

Corona was wearing a t-shirt and athletic shorts, with an elastic/drawstring waistband, when he was shot.  He weighed 305 pounds.

After DeLeon testified that Corona had been holding a gun in his waistband shortly before the shooting, Nick Ryan—who was the investigating detective—testified, in rebuttal, that he reviewed Corona's Facebook account, where he discovered a photograph of a chrome-colored 686 Smith & Wesson revolver.

Ryan also testified that he conducted an experiment to assess whether one could physically hold such a revolver in the waistband of athletic shorts.  Specifically, Ryan—who weighed about 190 pounds and was familiar with Smith & Wesson

revolvers—testified that he put on a t-shirt and basketball shorts and tucked his own 586 Smith and Wesson revolver into the waistband of his shorts. He explained that the 586 model only differed from the 686 model in that they were different colors and Ryan's gun was smaller—both in weight and barrel length—than the 686.

After this foundation was laid, the trial court admitted, over DeLeon's "foundation" objection, a video of Officer Ryan's experiment. The video shows Ryan wearing basketball shorts and stating that he had tied the shorts as tight as he could. Immediately after Ryan places his revolver into the waistband of his shorts and removes his hand, the gun falls out of the waistband and down through his shorts' legs.

**3.**

DeLeon contends the People did not demonstrate that Ryan's experimental conditions sufficiently resembled actual conditions. We need not resolve this question. Even if we assume the trial court abused its discretion (see *People v. Peterson, supra,* 10 Cal.5th at p. 460 [standard of review]), any error was harmless.

We consider the question of prejudice under the *People v. Watson* (1956) 46 Cal.2d 818, 836 standard because DeLeon fails to support his argument that the purported error violated his constitutional rights. (See *People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Bonin* (1989) 47 Cal.3d 808, 847-848.)

It is not reasonably probable the jury would have reached a more favorable verdict without the assumed evidentiary error. (*People v. Bonin, supra,* 47 Cal.3d at p. 848.) The prosecution presented other compelling evidence of DeLeon's guilt. And DeLeon's self-serving testimony that Corona had a gun was weak even without the experimental evidence. No other witness testified that Corona was armed at the time of the shooting, and

12

the police did not find a gun or any ammunition at the scene, in Corona's truck, or at Corona's apartment.

Notably, DeLeon never once mentioned being threatened with a gun in numerous calls to friends and family from jail, despite extensive discussion in these calls of the case, the evidence, and possible defenses. DeLeon explained the shooting to his girlfriend, for example, by saying that "[Corona] was runnin' his fuckin' mouth" and "tried to push up on me." In another call, DeLeon and his girlfriend discussed a possible alibi defense—that he was with her at the time of the murder. As his girlfriend put it, "you have to worry about your story, so, you need an alibi." DeLeon responded, "Yeah. For sure." In yet another call, DeLeon's girlfriend suggested that DeLeon acted in self-defense because Corona had *a bat*.

On this record, any error was harmless.

## C.

Finally, DeLeon challenges the trial court's decision to decline to strike the firearm use enhancement in furtherance of justice (§ 12022.53, subd. (h)). He shows no abuse of discretion. (See *People v. Pearson* (2019) 38 Cal.App.5th 112, 116 (*Pearson*) [standard of review].)

## 1.

Before 2018, trial courts were required to impose additional punishment for firearm enhancements found true. (§ 12022.53, subds. (d), (h), as enacted by Stats. 2010, ch. 711, § 5.) But trial courts now (and at the time DeLeon was sentenced) have discretion to strike or dismiss them "in the interest of justice." (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018; *People v. Flores* (2021) 63 Cal.App.5th 368, 376.)

While DeLeon's appeal was pending, our Supreme Court resolved a split of authority about whether a court may also

13

reduce the punishment imposed for the particular firearm enhancement at issue here—which provides for a term of 25 years to life under section 12022.53, subdivision (d)—by imposing a lesser uncharged firearm enhancement under subdivisions (b) or (c).  (*People v. Tirado* (2022) 12 Cal.5th 688, 696-697, 700 (*Tirado*).)  Our Supreme Court concluded: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53(b) or (c)."  (*Tirado, supra,* at p. 700.)[3]

**2.**

The jury found true an enhancement allegation that DeLeon personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  However, at sentencing, DeLeon's counsel asked the trial court to exercise its discretion to strike the firearm enhancement, in furtherance of justice.  Despite not having been specifically charged with such lesser enhancements, DeLeon's counsel asked the trial court, in the alternative, to impose a lesser enhancement under subdivisions

---

[3] A conflict existed at the time of DeLeon's sentencing.  (*Tirado, supra*, 12 Cal.5th at pp. 696-697 [discussing conflict between *People v. Morrison* (2019) 34 Cal.App.5th 217, 222-223 [court has discretion to impose uncharged lesser enhancement] and *People v. Tirado* (2019) 38 Cal.App.5th 637, 643 [uncharged lesser enhancement cannot be imposed], revd. by *Tirado, supra*, 12 Cal.5th at p. 700].)  In his opening brief on appeal, DeLeon appears to concede that the trial court was aware of its discretion to impose an uncharged lesser enhancement under section 12022.53, subdivisions (b) or (c).  It is not until his reply brief that he asks us to remand the matter for the trial court to consider anew whether to impose such a lesser enhancement.  Accordingly, he forfeited the argument.  (See *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.)

(b) or (c) of the statute.  In support of his requests, DeLeon pointed out his age (22 years old) at the time the crimes were committed, his history of childhood trauma, and the fact that he had not previously been convicted of a violent crime.

The trial court denied DeLeon's request, stating: "As to the enhancement under 12022.53(d), I think the reason we have that provision is the legislative desire to get guns off the street and this is one way to do it."  Accordingly, in addition to imposing a term of 15 years to life for second degree murder, the court imposed a consecutive term of 25 years to life for the aggravated firearm enhancement (§ 12022.53, subd. (d)).

**3.**

DeLeon maintains the trial court abused its discretion because it relied on an impermissible factor.  He is wrong.

In deciding whether to strike a firearm enhancement in the interest of justice, the trial court must consider the same factors it is required to consider when sentencing in the first instance. (*Pearson, supra*, 38 Cal.App.5th at pp. 116-117.)  Those factors include general sentencing objectives (including protecting society and deterrence of criminal conduct), whether the victim was particularly vulnerable, whether the defendant was armed or used a weapon in committing the crime, and whether the crime involved great violence, threat of great bodily harm, or a high degree of cruelty, viciousness, or callousness.  (*Id.* at p. 117; Cal. Rules of Court, rules 4.410 & 4.421.)

DeLeon's argument appears to be grounded only in the fact that the trial court did not explicitly mention any of the above factors on the record when it made its ruling.  But we presume the trial court considered the correct factors *unless* the record *affirmatively* shows otherwise.  (*Pearson, supra*, 38 Cal.App.5th at p. 117.)

15

Here, nothing in the record indicates the trial court failed to follow the law.  It heard relevant argument from the prosecutor and defense counsel.  And, in explaining its decision, the trial court merely indicated that imposition of the 25 years to life enhancement furthered the deterrence and protective purposes of the statute.  The trial court was not wrong about the legislative intent.  (See Stats. 1997, ch. 503, § 1 ["Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime"].)

DeLeon fails to show that the trial court abused its discretion.  (See *Tirado, supra,* 12 Cal.5th at p. 701.)

## DISPOSITION

The judgment is affirmed.

16

_____
BURNS, J.

We concur:

_____
SIMONS, ACTING P.J.

_____
WISEMAN, J.*

A159925

17